IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| JAMES WILSON CHESHER, and CHERYL ANN CHESHER, | ) ) ) | |
| Plaintiffs, | ) ) | No. 3:15-cv-02123-DCN |
| vs. | ) ) | **ORDER** |
| 3M COMPANY, et al., | ) ) | |
| Defendants. | ) ) ) | |

This matter is before the court on defendant Crane Co.'s ("Crane") motion for summary judgment. For the reasons stated below, the court denies Crane's motion.

## I. BACKGROUND

Plaintiff James Wilson Chesher ("Chesher"), a former machinist mate and a commissioned officer in the U.S. Navy, together with his wife, plaintiff Cheryl Ann Chesher (together "plaintiffs"), allege that Chesher's exposure to asbestos throughout his Naval career, caused him to develop mesothelioma. Compl. ¶¶ 31–34. Chesher served in the Navy from 1965 to 1989. For a significant portion of his career, Chesher conducted or oversaw maintenance and repair work on various types of equipment, including valves and de-aerating feed tanks—large tanks which remove dissolved oxygen from the water before it is sent to the boiler. ECF No. 226-1, Chesher Video Dep. at 21:21–22:17, 26:10–22; ECF No. 226-2, Chesher First Dep. at 147:7–14. Chesher's work on valves required him, or his subordinate, to remove and replace internal packing and bonnet gaskets, which were frequently made from asbestos-containing materials. Chesher Video Dep. at 26:10–22 (describing work on internal packing and bonnet gaskets); ECF No.

1

226-9, Pantaleoni Dep. at 24:5–26:24, 57:7–25, 63:3–64:22, 72:9–18 (discussing

drawings of valves approved for use by the Navy that specified the use of asbestos-

containing materials); ECF No. 226-10, Moore Aff. ¶ 17 (noting that Crane drawings

specified use of asbestos containing internal packing and bonnet gaskets for certain

valves installed on the USS Henderson and USS Fox).  This work produced dust which

Chesher breathed in.  Pantaleoni Dep. at 27:20–28:25, 30:1–30:21.  Chesher's work on

de-aerating feed tanks required him to access nozzles inside the tank by crawling through

a manhole.  Chesher First Dep. at 53:11–15.  The record contains evidence that this

manhole was sealed by an asbestos-containing gasket, Moore Aff. ¶ 19, which needed to

be removed and replaced whenever the tank was inspected.  ECF No. 226-3, Chesher

Second Dep. at 456:13–18.

Crane supplied valves for use on board the ships where Chesher performed, or

closely supervised, valve maintenance.[1]  ECF No. 226-8, Crane Answers to Interrogs. at

20.  Indeed, Chesher recalls working on Crane valves frequently throughout his career.

Chesher Second Dep. at 420:4–15.  Though Crane did not manufacture asbestos-

containing sheet packing or gaskets, these products were installed in Crane's valves at the

time they were supplied to the Navy, see Pantaleoni Dep. at 24:5–11, 24:24–25:5

(indicating that Crane would have to provide component parts as specified in design

drawings at time of delivery), and Crane was aware that the valves' sheet packing and

---

[1] Crane admits to supplying valves to the USS Cadmus, USS Fox, USS Mahan, and USS Pratt.  ECF No. 226-8, Answers to Interrogs. 20.  Crane cannot confirm whether it sold valves for use on the USS Henderson and USS Kraus, but has found documentation indicating that its valves were approved for use on those ships.  Id. Additionally, plaintiffs' expert contends that Crane's documents show that it supplied valves used on the USS Henderson, USS Fox, and USS Kraus.  Moore Aff. ¶ 17.  The court finds this evidence sufficient to raise a genuine issue of fact as to whether Crane valves were used on all the ships Chesher served on during the relevant portion of his career.

gaskets would need to be replaced periodically.  ECF No. 226-5, Crane Catalog No. 60 at

10–11.  Crane is also alleged to be the successor-in-interest to Cochrane Corp.

("Cochrane"), which manufactured the de-aerating feed tanks for two of the ships on

which Chesher served.  Moore Aff. ¶ 19.  Like the gaskets used in Crane valves, the

gaskets used to seal the manhole on the de-aerating feed tanks would have been replaced

periodically—namely, each time the tanks were opened.  Id. ¶ 20.

On April 15, 2015, plaintiffs brought the instant action in the Court of Common

Pleas in Richland County, South Carolina, alleging claims for negligence, gross-

negligence, negligence per se, conscious pain and suffering, punitive damages, and loss

of consortium against a number of defendants.  The action was removed to this court on

May 22, 2015.  On March 4, 2016, Crane filed the instant motion for summary judgment.

ECF No. 187.  Plaintiffs filed a response on April 4, 2016, ECF No. 226, and Crane filed

a reply on April 14, 2016.  ECF No. 230.  The court held a hearing on June 2, 2016, and

ordered the parties to conduct supplemental briefing.  Plaintiffs filed their supplemental

brief on June 3, 2016, ECF No. 248, and Crane filed a response on June 8, 2016.  ECF

No. 249.  The motion is now ripe for the court's review.

## II.  STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine dispute as to

any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Id.</u> at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Id.</u> at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Id.</u> at 322. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. <u>Anderson</u>, 477 U.S. at 255.

### III.   DISCUSSION

#### A.     Jurisdiction and Choice of Law

At the outset, the court notes that there is no dispute that court has admiralty jurisdiction over this action. Def.'s Mot. 5–7; Pls.' Resp. 9. Because the Court has admiralty jurisdiction, it must apply maritime law. <u>See</u> <u>E. River S.S. Corp. v. Transamerica Delaval, Inc.</u>, 476 U.S. 858, 864 (1986) ("With admiralty jurisdiction comes the application of substantive admiralty law."). "Drawn from state and federal

4

sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." Id. at 864–65. "The role of state law in maritime cases is significant and complex." Wells v. Liddy, 186 F.3d 505, 524 (4th Cir. 1999). A "fundamental feature of admiralty law" is that "federal admiralty courts sometimes do apply state law." Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 546 (1995). State law may be used to supplement federal maritime law as long as state law is "compatible with substantive maritime policies" and is not "inconsonant with the substance of federal maritime law." Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 202 (1996); see also Askew v. Am. Waterways Operators, Inc., 411 U.S. 325, 341 (1973) ("Even though Congress has acted in the admiralty area, state regulation is permissible, absent a clear conflict with the federal law."); Princess Cruises, Inc. v. Gen. Elec. Co., 143 F.3d 828, 834 (4th Cir. 1998) ("When no federal statute or well-established rule of admiralty exists, admiralty law may look to the common law or to state law, either statutory or decisional, to supply the rule of decision."); Byrd v. Byrd, 657 F.2d 615, 617 (4th Cir. 1981) ("[A]dmiralty law, at times, looks to state law, either statutory or decisional, to supply the rule of decision where there is no admiralty rule on point."). However, "state law may not be applied if it conflicts with, or seeks to materially change, federal maritime law." E.g., State of Md. Dep't of Natural Res. v. Kellum, 51 F.3d 1220, 1226 (4th Cir. 1995). Thus, the court must apply substantive maritime law supplemented by state law to the extent that it does not conflict with well-established maritime law.

### B.     Duty to Warn Under Maritime Law

Crane argues that it cannot be held liable for Chesher's injuries because there is no evidence that he was ever exposed to any asbestos-containing products that were manufactured or distributed by Crane.  Def.'s Mot. 8.  This argument, commonly known as the "bare metal defense," is premised on the assertion that a product manufacturer is not responsible for harms caused by a product it did not manufacture or supply.  Products Liability, 3 The Law of Seamen § 31:6 (5th ed.).  Plaintiffs contend that, in certain narrow circumstances, the bare metal defense is unavailable and an equipment manufacturer may be held liable for its failure to warn of risks arising from exposure to asbestos-containing components supplied by third parties.  Pls.' Resp. 9–11.  The bare metal defense has garnered increased attention in recent years as courts have sought to determine whether it applies in cases where the defendant's products did not contain the actual asbestos fibers that the plaintiff inhaled, but were nonetheless integral to the plaintiff's asbestos exposure.  This court now joins this endeavor.

The starting point for any analysis of the bare metal defense under maritime law is Lindstrom v. A-C Prod. Liab. Trust, 424 F.3d 488 (6th Cir. 2005).  In Lindstrom, the Sixth Circuit addressed maritime law's requirements for establishing causation in a products liability action.  The court held regardless of whether the action was brought under a theory of negligence or strict liability, "a plaintiff must show, for each defendant, that (1) he was exposed to the defendant's product, and (2) the product was a substantial factor in causing the injury he suffered."  Id. at 492.  Applying this principle to the plaintiffs' claims against the manufacturers of certain pumps and valves that utilized asbestos-containing replacement parts, the Lindstrom court determined that the

defendants were entitled to summary judgment because the plaintiffs had not shown that the defendants actually manufactured the asbestos-containing material that caused their injuries.  Id. at 495–97 (holding that "Henry Vogt cannot be held responsible for material 'attached or connected' to its product on a claim of a manufacturing defect," "Coffin Turbo cannot be held responsible for the asbestos contained in another product," and "Ingersoll Rand cannot be held responsible for asbestos containing material that it was incorporated into its product post-manufacture").

In a case addressing similar facts, the federal asbestos multidistrict litigation ("MDL") court applied the same principle to the plaintiffs' failure-to-warn claims. Conner v. Alfa Laval, Inc., 842 F. Supp. 2d 791 (E.D. Pa. 2012).  In Conner, the plaintiffs alleged that the defendant-manufacturers were liable for their failure to warn of the risks associated with asbestos-containing replacement components used in their products.  The MDL court acknowledged that there was evidence that:

> [d]efendants knew Navy sailors would be exposed to asbestos while repairing and maintaining [d]efendants' products; that the products "required" asbestos insulation, gaskets, and packing; that [d]efendants sometimes shipped their products with asbestos components "already in place"; that [d]efendants supplied asbestos-containing replacement parts; and that their products required maintenance that would expose the sailors to asbestos-containing products.

Id.  Despite this evidence, the MDL court relied on Lindstrom and certain state court decisions to hold that, "under maritime law, a manufacturer is not liable for harm caused by, and owes no duty to warn of the hazards inherent in, asbestos products that the manufacturer did not manufacture or distribute."  See id. at 798–801 (discussing Lindstrom, and certain California and Washington state court decisions).  The MDL court also highlighted the public policy concerns underlying its decision, explaining that "public policy demands that the burden of accidental injuries caused by products intended

7

for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained," id. at 801 (quoting Restatement (Second) of Torts § 402A cmt. c (1965)), and concluding that these concerns "weigh against holding manufacturers liable for harm caused by asbestos products they did not manufacture or distribute because those manufacturers cannot account for the costs of liability created by the third parties' products." Id.

The court in Quirin v. Lorillard Tobacco Co. took a different approach. 17 F. Supp. 3d 760 (N.D. Ill. 2014). While the Quirin court acknowledged that Lindstrom appeared to preclude recovery for claims based on exposure to asbestos-containing replacement components, the court found that Lindstrom's holding was not determinative because the Lindstrom court did not discuss failure-to-warn claims. Id. at 768. The court also acknowledged the MDL court's decision in Conner, but explained that not all courts had applied the same approach when faced with this issue. Id. at 769. After surveying the caselaw, the court found that three basic approaches had emerged:

> Some courts have concluded that a defendant is liable whenever the use of asbestos in connection with its product is foreseeable. [] Conversely, other courts have concluded that a defendant is never liable when the material containing asbestos was supplied by a third party. [] Finally, some courts have followed a middle road, finding a duty where the use of asbestos-containing materials was specified by a defendant, was essential to the proper functioning of the defendant's product, or was for some other reason so inevitable that, by supplying the product, the defendant was responsible for introducing asbestos into the environment at issue.

Id. The court then adopted the "middle path" and held that while a manufacturer generally could not be held liable for materials it did not supply,

> a duty may attach where the defendant manufactured a product that, by necessity, contained asbestos components, where the asbestos-containing material was essential to the proper functioning of the defendant's product, and where the asbestos-containing material would necessarily be

8

replaced by other asbestos-containing material, whether supplied by the
original manufacturer or someone else.

Id. at 769–70.  The court described the scope of this duty in a number of ways,
contrasting cases where there was no evidence that the defendant "specified that its
[product] had to be used with asbestos-containing [material] or that the [product] required
such [material] to function properly."  Id. at 771.  The court also explained that "[t]he
duty attaches only when the manufacturer incorporated the asbestos-containing material
into its product."  Id. at 770.  Finally, the court concluded that "a manufacturer should
[not] avoid liability . . . , where it designed its products to be used with asbestos-
containing materials and actually incorporated asbestos-containing materials into the
products it sold,"  reasoning that when such criteria were satisfied "a jury could conclude
that it was not just foreseeable, but inevitable, that the product would subject those
working with it to the possible hazards of asbestos exposure."  Id. at 771.

        In recent years, a split has emerged between courts applying Quirin, or a similar,
Quirin-like approach, and courts adhering to Conner's more restrictive view of a
manufacturer's duty to warn.[2]  Compare Osterhout v. Crane Co., 2016 WL 6310765, at
*3 (N.D.N.Y. Oct. 27, 2016) (reiterating the court's previous adoption of the Quirin
analysis), Bell v. Foster Wheeler Energy Corp., 2016 WL 5780104, at *6 (E.D. La. Oct.
4, 2016) (holding that a manufacturer that incorporates asbestos components into its
finished product may be liable if the manufacturer's failure to warn of hazards associated
with "the original asbestos components . . . is a proximate cause of a subsequent harmful

---

[2] Not all courts that have applied a Quirin-like approach have formally adopted
Quirin, and even those that have purported to adopt Quirin have not been entirely
consistent in their interpretations of Quirin.  Nor have all of the courts that have strictly
applied the bare metal defense explicitly "adopted" or "followed" Conner.  Nevertheless,
the court views the Quirn and Conner decisions as representative of the two primary
approaches to this issue.

exposure to asbestos contained in an aftermarket replacement part" or "if the manufacturer negligently recommends the use of a defective aftermarket product") (emphasis in original),[3] Hedden v. CBS Corp., 2015 WL 5775570, at *14 (S.D. Ind. Sept. 30, 2015) (recognizing that, generally, "a manufacturer cannot be liable for asbestos products that it did not manufacture or distribute," but holding "the defendant may be liable for asbestos injuries" under the circumstances outlined in Quirin), Kochera v. Foster Wheeler, LLC, 2015 WL 5584749, at *4 (S.D. Ill. Sept. 23, 2015) ("Like the Quirin court, this Court is not convinced that a manufacturer should avoid liability on a failure to warn theory where it designed its products to be used with asbestos-containing materials."), and Andrews v. 3M Co., No. 2:13-cv-2055, 2015 WL 12831315, at *6 (D.S.C. May 22, 2015) ("[T]he Court follows Quirin and holds that [a manufacturer] can be legally responsible for internal asbestos-containing replacement packing under certain circumstances, even if there is no direct evidence that [the manufacturer] supplied the replacement packing."), on reconsideration, sub nom. Andrews v. CBS Corp., 2015 WL 12831342 (D.S.C. June 18, 2015),[4] with Evans v. CBS Corp., 2017 WL 240079, at *1 (D.

---

[3] Though the Bell court distinguished its analysis from Quirin, finding that Quirin's analysis overlooked "the differing liabilities of manufacturers of final products and component parts, and [] the differences between strict products liability actions and negligence actions," 2016 WL 5780104, at *5, this court reads the Bell decision to apply an approach that is much closer to Quirin than Conner. Not only did the Bell court flatly reject the defendants' argument that "a company can never have any liability for a product that it did not make, sell, or otherwise control," it also recognized that liability for "aftermarket asbestos products" may exist in circumstances similar to those outlined in Quirin, stating that, when asbestos-containing components are incorporated into a finished product and the plaintiff's harm is caused by "materially identical" replacement components, "it is hard to see how the manufacturer's breach of its duty to provide a suitable warning with respect to the original product is not at least one of the proximate causes of a resulting injury." Id. at *8 n.16.

[4] In addition to the decisions that have clearly adopted Quirin or some Quirin-like standard, the court is aware of two decisions—including one of its own—that have left

Del. Jan. 19, 2017) ("The so-called 'bare metal defense' is recognized by maritime law, such that a manufacturer has no liability for harms caused by—and no duty to warn about hazards associated with—a product it did not manufacture or distribute." (quoting Carper v. Gen. Elec. Co., 2014 WL 6736205, at *1 (E.D. Pa. Sept. 4, 2014)); Stallings v. Georgia-Pac. Corp., 2015 WL 7258518, at *4 (W.D. Ky. Nov. 17, 2015) (holding that "[a] company is not responsible for the asbestos contained in another manufacturer's product," and granting summary judgment where plaintiff failed to produce evidence that defendant-manufacturer provided the asbestos-containing replacement components that the decedent was exposed to), aff'd on other grounds, 2017 WL 87023 (6th Cir. Jan. 10, 2017),[5] Crews v. Air & Liquid Sys. Corp., 2014 WL 639685, at *5 (N.D.N.Y. Feb. 18,

---

the door open for Quirin, but have not adopted its analysis.  In Dandridge v. Crane Co., this court recognized the Quirin approach as

> a rational exception to the rule that a defendant "cannot be held responsible for the asbestos contained in another product,"[] because a product that "inevitably" subjects its user to "the possible hazards of asbestos exposure" and a product that actually contains asbestos bear comparable causal relationships to their users' injuries.

No. 2:12-cv-00484-DCN, 2016 WL 319938, at *3 (D.S.C. Jan. 27, 2016) (quoting Lindstrom, 424 F.3d at 496).  However, the court ultimately found that the plaintiff had failed to present sufficient evidence to survive summary judgment, even if Quirin applied.  Id.

Similarly, in Holzworth v. Alfa Laval Inc., the court found that the defendant was entitled to summary judgment, regardless of whether maritime law or New York law applied, because there was no evidence that the defendant "placed the asbestos-containing components into the stream of commerce, played an active role in their use, or manufactured pumps that required such components."  2016 WL 270450, at *4 (S.D.N.Y. Jan. 21, 2016).  Though the Holzworth court cited to New York law on the matter, the court recognized that "the relevant maritime law and state law are congruous."  Id. at *3.  The court further explained that the New York standard was equally, if not more permissive, than either the Quirin or Conner standards.

[5] The Stallings decision, much like the Lindstrom decision, never explicitly addressed failure-to-warn claims.  2015 WL 7258518, at *1 (noting that the plaintiff sought relief "under theories of strict liability and negligence").  Nevertheless, the court

2014) (holding that "Crane Co. had no duty to warn Plaintiff about the dangers of third-party products that were used with its valves because it neither had any control over the production of these products nor placed them into the stream of commerce"), Cabasug v. Crane Co., 989 F. Supp. 2d 1027, 1041 (D. Haw. 2013) (relying on Conner and holding that "under maritime law, a manufacturer is not liable for replacement parts that it did not place into the stream of commerce, whether the manufacturer's product originally contained asbestos components or was designed to include asbestos components), and Faddish v. Buffalo Pumps, 881 F. Supp. 2d 1361, 1373 (S.D. Fla. 2012) (applying the bare metal defense to grant equipment manufacturer-defendants summary judgment where plaintiff failed to present evidence that "any of [the] [asbestos-containing] replacement parts" that caused the plaintiff's injury were "made by any defendant or that defendants had any involvement with their installation").[6]

This rift has developed around a number of issues.[7] Some courts have debated the scope of the Sixth Circuit's holding in Lindstrom. Compare Devries v. Gen. Elec. Co., 188 F. Supp. 3d 454, 458 (E.D. Pa. 2016) (holding that Lindstrom extends to failure-to-warn claims, and therefore, "maritime law imposes no duty upon a product manufacturer to warn of the dangers associated with another manufacturer's 'product' (or component part)") and Cabasug, 989 F. Supp. 2d at 1039 (calling Lindstrom "instructive" on the

---

finds that the Lindstrom decision can be read to support the Conner approach, and for the same reasons, the court places the Stallings decision on the Conner side of the ledger.

[6] Though the Faddish court cited heavily to Florida law, the court only applied Florida law to the extent it was compatible with maritime law. 881 F. Supp. 2d at 1368 ("[I]n the context of this case, Florida law is appropriately applied unless it conflicts with the substantive rule of federal admiralty law."). The court viewed Florida law and maritime law as "parallel." Id. at 1369.

[7] The court does not mean to suggest that these are the only issues that have emerged, but simply views them as the most prevalent and meaningful issues that have driven courts' analyses.

12

scope of a manufacturer's duty to warn "for its determination that a manufacturer is not liable for a third party's replacement asbestos products"); with Andrews, 2015 WL 12831315, at *6 (distinguishing Lindstrom as "a manufacturing defect case [that] did not consider or discuss a failure-to-warn claim"). Courts have also reached different conclusions on which approach is more consistent with the majority position under state law.  Compare Bell, 2016 WL 5780104, at *2 (E.D. La. Oct. 4, 2016) ("[T]he recent trend in state court asbestos litigation has been to recognize limited circumstances in which a manufacturer can have duties to warn regarding a product that the manufacturer did not make, sell, or otherwise control.") with Cabasug, 989 F. Supp. 2d at 1042 (finding that "[p]laintiffs can hardly suggest that Lindstrom and Conner are outliers in their conclusions where they too cited state law cases in support of their analyses," and finding that the state law cases the plaintiffs provided in opposition were largely inapplicable to the question before the court).  Most importantly, courts have taken different positions on which view best serves the policies animating product-liability and maritime law. Compare Bell, 2016 WL 5780104, at *8 (finding that "the manufacturer of the finished product containing asbestos may well be better placed to warn when compared to the manufacturer of an aftermarket wear item"); with Conner, 842 F. Supp. 2d at 801 (finding that public policy considerations "weigh[] against holding manufacturers liable for harm caused by asbestos products they did not manufacture or distribute because those manufacturers cannot account for the costs of liability created by the third parties' products").  The court analyzes each of these issues in turn.

### 1.     Scope of the <u>Lindstrom</u> Decision

As noted above, the <u>Conner</u> court relied heavily on the <u>Lindstrom</u> decision in concluding that a manufacturer owes no duty to warn with respect to "asbestos products that the manufacturer did not manufacture or distribute."  <u>See</u> <u>Conner</u>, 842 F. Supp. 2d at 801 (construing this position as an "adoption" of <u>Lindstrom</u>).  In contrast, the <u>Quirin</u> court distinguished <u>Lindstrom</u> on the grounds that the <u>Lindstrom</u> decision did not discuss failure-to-warn claims.  <u>Quirin</u>, 17 F. Supp. 3d at 768.  More recently, the MDL court has identified this issue as "the source of divergence between the <u>Conner</u> and <u>Quirin</u> decisions."  <u>Devries</u>, 188 F. Supp. 3d at 463.  Courts that have adopted a <u>Quirin</u>-like approach to the failure-to-warn issue have generally avoided a direct challenge to the holding in <u>Lindstrom</u>, either by explicitly distinguishing it or implicitly suggesting that it did not require an application of the bare metal defense to failure-to-warn claims.  <u>See</u> <u>Hedden</u>, 2015 WL 5775570, at *11 (citing <u>Lindstrom</u> for the general principles of causation but nevertheless holding that a defendant may be liable under the circumstances outlined in <u>Quirin</u>); <u>Kochera</u>, 2015 WL 5584749, at *3 (same); <u>Andrews</u>, 2015 WL 12831315, at *6 (distinguishing <u>Lindstrom</u> as "a manufacturing defect case [that] did not consider or discuss a failure-to-warn claim"); <u>but see</u> <u>Bell</u>, 2016 WL 5780104, at *1 (reading <u>Lindstrom</u> to hold that a manufacturer can never be liable "unless the manufacturer made, sold, or otherwise controlled the precise aftermarket asbestos components that released the asbestos fibers that injured the plaintiff," and refusing to adopt such a view).  Thus, the interpretation of <u>Lindstrom</u> has served as something of a gateway issue into the <u>Quirin</u>-<u>Conner</u> debate.

In <u>Devries</u>, the MDL court explained its interpretation of <u>Lindstrom</u>, making it clear that it read <u>Lindstrom</u>'s reference to "both negligence and strict liability theories" to encompass failure-to-warn claims.  <u>Devries</u>, 188 F. Supp. 3d at 459 n.7.  Thus, in the MDL court's view, <u>Lindstrom</u> requires a plaintiff show "evidence of exposure to asbestos from the defendant's 'product'" in <u>any</u> products liability action brought under maritime law.  <u>Id.</u> at 460–61.  "Implicit in this rule is the holding that a product manufacturer has no duty to warn about hazards arising from another manufacturer's product (or component part)."  <u>Id.</u> at 460 n.11.

The court has no doubt that this is a fair reading of the <u>Lindstrom</u> decision. Indeed, other courts have adopted similar readings.  <u>See, e.g.</u>, <u>Bell</u>, 2016 WL 5780104, at *1 (reading <u>Lindstrom</u> to hold that a manufacturer can never be liable "unless the manufacturer made, sold, or otherwise controlled the precise aftermarket asbestos components that released the asbestos fibers that injured the plaintiff"); <u>Cabasug</u>, 989 F. Supp. 2d at 1039 (calling <u>Lindstrom</u> "instructive" on the scope of a manufacturer's duty to warn "for its determination that a manufacturer is not liable for a third party's replacement asbestos products").  Moreover, the court is hesitant to deviate from the MDL court's position, given the MDL court's expertise in this area of the law. Nevertheless, the court is convinced that the better reading of <u>Lindstrom</u> does not extend to failure-to-warn claims.  The <u>Lindstrom</u> court's reference to "negligence and strict liability theories" is at least ambiguous, 424 F.3d at 492, and the decision contains no discussion of failure-to-warn claims.  This alone has been enough to convince some courts—including one in this district—that <u>Lindstrom</u> does not extend to such claims. <u>Andrews</u>, 2015 WL 12831315, at *6 (distinguishing <u>Lindstrom</u> as "a manufacturing

defect case [that] did not consider or discuss a failure-to-warn claim"); <u>Quirin</u>, 17 F. Supp. 3d at 768 (distinguishing <u>Lindstrom</u> on the ground that it "did not discuss a failure-to-warn claim").

The court also finds that applying <u>Lindstrom</u> in the failure-to-warn context is conceptually problematic.  The <u>Lindstrom</u> court held that to prove causation, a plaintiff must prove that "he was exposed to the defendant's product, and [] the product was a substantial factor in causing the injury he suffered."  424 F.3d at 492.  This rule is straightforward enough when a manufacturer breaches its duty by supplying a defective product because the product serves as a physical embodiment of the breach.  Thus, causation can only be traced to the manufacturer through the manufacturer's own product.  The same is not true when a manufacturer breaches its duty to warn of a product's unreasonably dangerous condition.  In that situation, the breach does not arise out of the creation of the product itself but instead out of the manufacturer's failure to warn of the danger the product creates.  Restatement (Second) of Torts § 388 (1965). Conceptually then, the plaintiff's task is to establish a causal link between his injury and the manufacturer's omission, not the product itself.

It might be argued that this is a distinction without a difference—if the manufacturer's product did not cause the plaintiff's injury, there is no way causation could be traced to the manufacturer's failure to warn.  To be sure, these inquiries will frequently merge, but the fact remains that a manufacturer's failure to warn is distinct from the act of creating the product.  The court believes that, in certain narrow circumstances, a manufacturer's failure to warn of risks associated with its own product

can cause a plaintiff to suffer injury through another manufacturer's product.[8]  As the

Eastern District of Louisiana explained in Bell, where the plaintiff's injury is attributable

to "a replacement aftermarket wear item—i.e., a part that is designed to wear down and

be replaced," and that replacement wear item "is materially identical to a wear item in the

originally shipped product, it is hard to see how the manufacturer's breach of its duty to

provide a suitable warning with respect to the original product is not at least one of the

proximate causes of a resulting injury."  2016 WL 5780104, at *6 n.16.[9]  Thus, the

distinction may be quite narrow, but the court finds that it is not meaningless.  See id.

(stating that "such an exception . . . may well be quite narrow," "[b]ut that does not

justify a categorical rule" that an equipment manufacturer's failure to warn cannot

proximately cause "a sailor's exposure to a hazardous substance contained in an

aftermarket replacement component part").  Because Lindstrom's analysis does not

_____

[8] For the purposes of this discussion, the court assumes that the harm-causing "product" in question is the asbestos-containing component, not the piece of equipment itself.  If the harmful "product" is considered to be the piece of equipment, then Lindstrom poses no obstacle to a finding of liability in this case because Chesher was clearly exposed to Crane valves and de-aerating feed-tanks.

[9] The court recognizes that, unlike some courts that have applied Quirin, the Bell decision speaks in terms of the manufacturer's duty to warn with respect to its original product and not with respect to replacement components.  Bell, 2016 WL 5780104, at *6.  In fact, the Bell decision specifically rejects what it reads to be Quirin's holding—that "a manufacturer can be liable for failing to warn regarding asbestos when a manufacturer makes a product in which the use of asbestos components is 'essential to the proper function of the . . . product.'"  Id. at *4 (quoting Quirin, 17 F. Supp. 3d at 769–70).  This court does not read Quirin so broadly.  As discussed in greater detail below, the court finds that Quirin is constrained to cases where (1) the defendant actually incorporated asbestos-containing components into its original product, 17 F. Supp. 3d at 771, and (2) the defendant "specified" the use of asbestos-containing replacement components, or such components were "essential to the proper functioning" of the product.  Id. at 769, 771.  When these constraints are recognized, the court believes the practical effect is that Quirin imposes a duty to warn with respect to asbestos-containing replacement components under the same circumstances in which Bell indicates that a defendant's failure to warn with respect to the original asbestos-containing components constitutes a proximate cause of the plaintiff's injury.

17

account for this distinction, the court finds that it is better read to apply only to manufacturing or design defect claims, not failure-to-warn claims.

### 2.     Majority Rule Under State Law

Courts on both sides of the issue have also drawn support from cases applying state law.  See Bell, 2016 WL 5780104, at *5 (noting decisions under Pennsylvania, New York, Maryland, and California law that indicated—to varying degrees of certainty—that a manufacturer may have a duty to warn regarding a product the manufacturer does not produce); Conner, 842 F. Supp. 2d at 798 ("[A] number of state courts . . . that have considered this issue have similarly held that a defendant manufacturer is not liable for a third party's asbestos products when the defendant is not part of the "chain of distribution" of the asbestos product."); see also Cabasug, 989 F. Supp. 2d at 1039 (noting that the Conner decision demonstrated how its position was "consistent with several state court decisions addressing replacement parts"); Quirin, 17 F. Supp. 3d at 770 ("The California Supreme Court, which approved of the bare metal defense . . . , also left room for an exception to the rule.").  Looking to state law is particularly significant in this case, given the split that has emerged in the federal courts addressing this issue under maritime law.[10]  Princess Cruises, Inc. v. Gen. Elec. Co., 143 F.3d 828, 834 (4th Cir.

---

[10] While the court believes that this issue is best characterized as "unsettled" under maritime law, it notes that the trend appears to be moving away from Conner's strict application of the bare metal defense.  If one counts Quirin, then courts in six separate jurisdictions—the Northern District of New York, Eastern District of Louisiana, Southern District of Indiana, Southern District of Illinois, District of South Carolina, and Northern District of Illinois—have held, or at least suggested, that an equipment manufacturer may be held liable on a failure-to-warn theory for harm caused by asbestos-containing replacement components.  Osterhout, 2016 WL 6310765, at *3; Bell, 2016 WL 5780104, at *6; Hedden, 2015 WL 5775570, at *14; Kochera, 2015 WL 5584749, at *4; Andrews, 2015 WL 12831315, at *6; Quirin, 17 F. Supp. 3d at 769–71.  Similarly, if one includes the MDL court, then courts in six jurisdictions—the District of Delaware, Western District of Kentucky, Northern District of New York, District of Hawaii,

1998) ("When no federal statute or well-established rule of admiralty exists, admiralty law may look to the common law or to state law, either statutory or decisional, to supply the rule of decision.").

Courts that have endorsed a strict application of the bare metal defense often discuss three state court decisions:  Simonetta v. Viad Corp., 197 P.3d 127 (Wash. 2008), Braaten v. Saberhagen Holdings, 198 P.3d 493 (Wash. 2008), and O'Neil v. Crane Co., 266 P.3d 987 (Cal. 2012).  See Conner, 842 F. Supp. 2d at 798–800 (discussing Simonetta, Braaten, and O'Neil as decisions which "have [] held that a defendant manufacturer is not liable for a third party's asbestos products when the defendant is not part of the 'chain of distribution' of the asbestos product"); see also Cabasug, 989 F. Supp. 2d at 1039–41 (reviewing and endorsing the Conner court's evaluation of Simonetta, Braaten, and O'Neil); Devries, 188 F. Supp. 3d at 463 (describing Conner's interpretation of Lindstrom as "consistent with [the rules set forth under] state law in O'Neil, Simonetta, and Braaten—decisions which each considered and relied upon Lindstrom in determining its respective rule of law regarding negligent failure-to-warn"). However, there are problems with relying on Simonetta, Braaten, and O'Neil to hold that

Southern District of Florida, and Eastern District of Pennsylvania—have adopted, or at least suggested, the opposite conclusion.  Evans, 2017 WL 240079, at *1; Stallings, 2015 WL 7258518, at *4; Crews, 2014 WL 639685, at *5; Cabasug, 989 F. Supp. 2d at 1041; Faddish, 881 F. Supp. 2d at 1373; Conner, 842 F. Supp. 2d at 798–801.  However, if one looks only to courts that have taken a position after Quirin was decided, the count is five to four in favor of Quirin—and that is counting the MDL court's reaffirmation of the Conner approach in Devries, 188 F. Supp. 3d at 460–61, but not counting Quirin itself. Moreover, of the two Northern District of New York decisions that appear to have reached different conclusions—the Osterhout decision, which adopted Quirin, in no uncertain terms, 2016 WL 6310765, at *3, and the Crews decision, which applied the bare metal defense, 2014 WL 639685, at *5—the Osterhout decision was issued more recently.  See Osterhout, 2016 WL 6310765 (decided October 27, 2016); Crews, 2014 WL 639685 (decided February 18, 2014).  When all of these decisions are considered together, the court finds that the scales tip slightly in favor of the Quirin approach, but not enough to foreclose the need for further analysis.

an equipment manufacturer can never be liable for injury caused by asbestos-containing replacement components. As an initial matter, each of these decisions stopped short of foreclosing the availability of a failure-to-warn claim in the circumstances outlined in Quirin—namely, where (1) the defendant actually incorporated asbestos-containing components into its original product, Quirin, 17 F. Supp. 3d at 771, and (2) the defendant "specified" the use of asbestos-containing replacement components, or such components were "essential to the proper functioning" of the product. Id. at 769, 771.

In the companion cases of Simonetta and Braaten, the Supreme Court of Washington held that the equipment manufacturer defendants did not have a duty to warn of the risks associated with asbestos-containing replacement components because they were not part of the "chain of distribution" of the hazardous products, even if those risks were foreseeable. Simonetta, 197 P.3d at 138 ("Because [defendant] was not in the chain of distribution of the dangerous product, we conclude not only that it had no duty to warn under negligence, but also that it cannot be strictly liable for failure to warn."); Braaten, 198 P.3d at 504 ("As we held in Simonetta, a manufacturer has no duty under common law products liability or negligence principles to warn of the dangers of exposure to asbestos in products it did not manufacture and for which the manufacturer was not in the chain of distribution."). But in Simonetta, it was "undisputed that [the defendant] sold the evaporator without insulation and that it did not manufacture, sell, or select the asbestos insulation" in question. Simonetta, 197 P.3d at 138. Thus, the Simonetta plaintiffs' claims would have also failed under Quirin, which requires a showing that the manufacturer actually incorporated asbestos into the product when it was originally sold. See Dandridge, 2016 WL 319938, at *4 (holding that summary judgment would be

appropriate under <u>Quirin</u> where "there [was] no evidence that [the defendant] 'actually incorporated asbestos-containing materials into the products it sold'").

The <u>Braaten</u> decision came somewhat closer to addressing the circumstances outlined in <u>Quirin</u>.  In that case, there was evidence that "some of the defendants' products originally contained packing and gaskets with asbestos."  <u>Braaten</u>, 198 P.3d at 496.  The court found these facts were not sufficient to support a failure-to-warn claim against the defendants for asbestos-containing products they did not supply, but explicitly stated that

> we need not and do not reach the issue of whether a duty to warn might arise with respect to the danger of exposure to asbestos-containing products specified by the manufacturer to be applied to, in, or connected to their products, or required because of a peculiar, unusual, or unique design.

<u>Id.</u>  Because <u>Quirin</u> requires those very conditions to be met, the court concludes that the decision in <u>Braaten</u> also falls short of foreclosing a failure-to-warn claim under <u>Quirin</u>.

Moreover, the Washington law has moved toward the <u>Quirin</u> approach in the years since <u>Simonetta</u> and <u>Braaten</u> were decided.  As the MDL court has acknowledged,

> the Supreme Court of Washington appears to have since retreated somewhat from its earlier adoption of the so-called 'bare metal defense' in <u>Simonetta</u> . . . and <u>Braaten</u> . . . [by later] distinguish[ing] the facts in <u>Macias v. Saberhagen Holdings, Inc.</u>, 282 P.3d 1069 (Wash. 2012), and holding that a product manufacturer can at least sometimes be liable for failure to warn of the hazards of asbestos exposure that necessarily occurs as a result of the intended use of the product for the purpose for which it was designed—even if the product itself did not contain asbestos when manufactured and supplied, and the asbestos was released from another manufacturer's product.

<u>Devries</u>, 188 F. Supp. 3d at 456 n.4 (alterations in original) (quoting <u>Schwartz v. Abex Corp.</u>, 106 F. Supp. 3d 626, 646 (E.D. Pa. 2015)).  The critical distinction offered by the <u>Macias</u> court was that, in <u>Simonetta</u> and <u>Braaten</u>, "the manufacturers' products did not, in

and of themselves, pose any <u>inherent</u> danger of exposure to asbestos," whereas in <u>Macias</u>, when the "the products were used exactly as intended . . . they <u>inherently</u> and invariably posed the danger of exposure to asbestos." 282 P.3d at 1077 (emphasis in original). Such reasoning is quite analogous to the <u>Quirin</u> court's focus on "inevitability." <u>Quirin</u>, 17 F. Supp. 3d at 771. Thus, the law of Washington actually appears more consistent with the <u>Quirin</u> approach than with <u>Conner</u>'s strict application of the bare metal defense.

As for the Supreme Court of California's decision in <u>O'Neil</u>, the court need look no further than footnote 6 of the opinion to see that, like the <u>Simonetta</u> and <u>Braaten</u> decisions, it cannot be read to impose an absolute prohibition on liability for asbestos-containing replacement parts. In <u>O'Neil</u>, the plaintiffs argued that the defendants' products were "defective because they were 'designed to be used' with asbestos-containing components." <u>O'Neil</u>, 266 P.3d at 996. The court first held the "mere compatibility" with asbestos-containing components was insufficient to impose liability on the defendants. <u>Id.</u> Then, in footnote 6, the court explained that:

> A stronger argument for liability might be made in the case of a product that <u>required</u> the use of a defective part in order to operate. In such a case, the finished product would inevitably incorporate a defect. One could argue that replacement of the original defective part with an identically defective one supplied by another manufacturer would not break the chain of causation. Similarly, if the product manufacturer specified or required the use of a defective replacement part, a stronger case could be made that the manufacturer's failure to warn was a proximate cause of resulting injury. In both contexts, however, the policy rationales against imposing liability on a manufacturer for a defective part it did not produce or supply would remain. [] These difficult questions are not presented in the case before us, and we express no opinion on their appropriate resolution.

Id. at 996 n.6 (emphasis in original).  Again, the Quirin approach is explicitly restricted to the circumstances addressed in footnote 6 of the O'Neil decision.[11]  It is true that the O'Neil court did not tip its hand on whether or not California law would recognize a claim in such circumstances.  Though it extolled the logical virtues of such a claim, it also noted that even in the circumstances outlined in footnote 6, "the policy rationales against imposing liability on a manufacturer for a defective part it did not produce or supply would remain."[12] Id. at 996 n.6.  But the fact remains that the court did not take a position either way.  Because the O'Neil decision explicitly declined to address the issue, the court finds that it does not weigh for or against the Quirin approach in determining the majority position under state law.

While the Simonetta, Braaten, and O'Neil decisions provide little, if any, support for the Conner approach, the Southern District of Florida's decision in Faddish was far less equivocal.  881 F. Supp. 2d 1361.  Though Faddish was a maritime law case, the court applied Florida law after determining that Florida law and maritime law were not inconsistent on the issue.  Id. at 1369.  Thus, the Faddish decision not only endorsed the Conner approach under maritime law, but also provided a thorough analysis of the issue under Florida law.  Id. at 1370–72.  The Faddish court adopted a strict application of the bare metal defense, concluding that manufacturers could not be held liable for a plaintiff's exposure to asbestos-containing replacement parts where there was "no evidence that any of these replacement parts [were] made by any defendant or that defendants had any involvement with their installation."  Id. at 1373.  Notably, the court

---

[11] In fact, Quirin's application is even narrower, given its "actual incorporation" requirement.  See Quirin, 17 F. Supp. 3d at 771 (imposing liability where defendant designed products to be used with asbestos and "actually incorporated asbestos-containing materials into the products it sold").

[12] These policy arguments are discussed in greater detail in part III.B.3. below.

reached this conclusion even though there was evidence that some of the defendants' products contained asbestos-containing components when they were originally distributed and it was foreseeable[13] that such components would need to be replaced.  Id. Thus, the court concludes that the Conner approach is consistent with Florida law.[14]

Unsurprisingly, this is not enough to conclude that Conner represents the majority approach.  There are a number of state court decisions recognizing exceptions to the bare metal defense that are at least as permissive as Quirin.  See, e.g., In re N.Y.C. Asbestos

_____

[13] One might argue that Faddish can be distinguished because it rejected liability premised on "foreseeability" rather than "inevitability."  The court does think this distinction is important in the application of the Quirin approach, but finds that the thrust of the Faddish decision cannot be distinguished so easily, especially when one recognizes that the Faddish court viewed its decision as consistent with Conner.  See Faddish, 881 F. Supp. 2d at 1368 (S.D. Fla. 2012).

[14] The court is aware of several other decisions that applied the bare metal defense under state law, but stopped short of rejecting a Quirin-like claim.  In Morgan v. Bill Vann Co., the court applied Alabama law to hold that the defendant-manufacturer "[was] not liable for harm caused by, and owed no duty to warn [the plaintiff] or anyone else concerning the hazards of, asbestos-containing packing and gaskets that users of [its] pumps might install, where [it] did not manufacture, sell or distribute such asbestos-containing components."  969 F. Supp. 2d 1358, 1369 (S.D. Ala. 2013).  However, the Morgan court did not determine the legal merits of the plaintiff's argument that the defendant "specified particular gaskets and packing for use [] and is therefore culpable for any asbestos exposure [] arising from such specifications," instead rejecting that argument on the facts.  Id. at 1371.  Similarly, the court in In re Asbestos Litigation determined that, under Utah law, a "[d]efendant is not liable under a failure to warn claim for asbestos-containing products added to its products after sale," but then noted that "[plaintiff] has not provided evidence in the record that [d]efendant specified, required, or recommended asbestos-containing products be added to its products on which [p]laintiff actually worked," suggesting that a Quirin-like exception may exist.  2012 WL 1408982, at *3 (Del. Super. Ct. Apr. 2, 2012).  Finally, in Thurmon v. Georgia Pacific, LLC, the court held that, under Georgia law, a plaintiff must show that his injury was caused by the defendant's own product, but also appeared to recognize that a valve that required the use of asbestos-containing gaskets would be considered a defective product.  650 F. App'x 752, 758–59 (11th Cir. 2016) ("[I]n order to survive summary judgment, the plaintiffs had to offer some evidence that Thurmon's injuries were caused by a Crane Co. valve that required the use of asbestos-containing gaskets to function properly.").  Perhaps these decisions provide some additional support for the Conner approach, but the court finds that even if they were counted, they would be insufficient to tip the scales in favor of Conner over Quirin.

<u>Litig.</u>, 59 N.E.3d 458, 471 (N.Y. 2016) ("[T]he manufacturer of a product has a duty to warn of the danger arising from the known and reasonably foreseeable use of its product in combination with a third-party product which, as a matter of design, mechanics or economic necessity, is necessary to enable the manufacturer's product to function as intended."); <u>McKenzie v. A.W. Chesterson Co.</u>, 373 P.3d 150, 160–62 (Or. Ct. App. 2016), <u>review denied sub nom.</u>, 381 P.3d 841 (Or. 2016) (rejecting bare metal defense where it was foreseeable that plaintiff would be exposed to asbestos-containing replacement components); <u>May v. Air & Liquid Sys. Corp.</u>, 129 A.3d 984, 1000 (Md. 2015) ("[A] manufacturer will have a duty to warn under negligence and strict liability when (1) its product contains asbestos components, and no safer material is available; (2) asbestos is a critical part of the pump sold by the manufacturer; (3) periodic maintenance involving handling asbestos gaskets and packing is required; and (4) the manufacturer knows or should know the risks from exposure to asbestos."); <u>Schwartz</u>, 106 F. Supp. 3d at 655 ("[U]nder Pennsylvania law, a product manufacturer has a [] duty to warn about the asbestos hazards of a component part later used with its product, which it neither manufactured nor supplied . . . , if the manufacturer knew its product would be used with that type of asbestos-containing component . . . ."); <u>Garvin v. AGCO Corp.</u>, Case No. 2012-cp-40-6675, slip op. at 15–18 (S.C. Ct. C.P. December 10, 2014) (expressing approval of <u>Quirin</u> and holding that a manufacturer may be liable for harm caused by asbestos-containing replacement gaskets and packing when "[the] manufacturer recommends, specifies, or requires that asbestos gaskets and packing be replaced with like materials").  As noted above, it also appears that Washington has adopted a similar position, recognizing that liability may be imposed where a manufacturer's product

"inherently and invariably pose[s] [a] danger of exposure to asbestos."  Macias, 282 P.3d at 1077 (emphasis omitted).  In light of the recent trend towards recognizing a manufacturer's duty to warn with respect to replacement parts in limited circumstances, and the fact that Conner's support at the state level was rather measured to begin with, the court finds that the Quirin approach is more consistent with the majority view under state law.

### 3.      Policy Considerations

Policy considerations have also played an important role in the courts' treatment of this issue.  E.g., Conner, 842 F. Supp. 2d at 801.  Indeed, courts have recognized that the scope of a legal duty is essentially a matter of policy.  See In re N.Y.C. Asbestos Litig., 59 N.E.3d at 469 (listing various, policy-based factors used to determine whether a duty exists in a particular situation, including "the most reasonable allocation of risks, [the] burdens and costs among the parties and within society, . . . economic impact, . . . the person [] best positioned to avoid the harm[,] . . . the public policy served by the presence or absence of a duty and the logical basis of a duty."); Devries, 188 F. Supp. 3d at 463 (distinguishing state law cases rejecting the bare metal defense on the ground that "[t]he rule of law set forth in each of these cases reflects a policy determination of that particular state—a policy determination which need not be consistent with the policy determination underlying maritime law"); May, 129 A.3d at 994 ("We have recognized that '[a]t its core, the determination of whether a duty exists represents a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant.'" (quoting Gourdine v. Crews, 955 A.2d 769, 783 (Md. 2008))).  This does not mean that a court is free to impose its own policy preferences; the court must ask whether the law has

already made this policy determination and account for the doctrinal framework in which the question arises. However, in this case, since there is no clearly established rule,[15] the court believes policy considerations must be accorded significant weight.

While courts have almost universally recognized the role policy considerations play in analyzing this issue, they have disagreed on which approach these considerations favor. Compare Bell, 2016 WL 5780104, at *8 (finding that "the manufacturer of the finished product containing asbestos may well be better placed to warn when compared to the manufacturer of an aftermarket wear item"); In re N.Y.C. Asbestos Litig., 59 N.E.3d at 473 ("The endorsement of a manufacturer's duty to warn against certain combined uses of its product and a third-party product comports with the long-standing public policy underlying products liability in New York."); with Conner, 842 F. Supp. 2d at 801 (finding that public policy considerations "weigh[] against holding manufacturers liable for harm caused by asbestos products they did not manufacture or distribute because those manufacturers cannot account for the costs of liability created by the third parties' products"). Courts have justified the bare metal defense on the ground that recognizing liability for third-party replacement components would impose too great a cost on the original equipment manufacturers. Conner, 842 F. Supp. 2d at 801; see also O'Neil, 266 P.3d at 1005–06 (explaining that "a manufacturer cannot be expected to exert pressure on other manufacturers to make their products safe and will not be able to share the costs of ensuring product safety" and that "[i]t is [] unfair to require manufacturers of nondefective products to shoulder a burden of liability when they

---

[15] As the court noted above in footnote 10, the Quirin approach does appear to at least have more support in recent decisions.

derived no economic benefit from the sale of the products that injured the plaintiff").[16]
As a general matter, this is a sound proposition. Manufacturers cannot control the risks
associated with every product that might foreseeably be used in conjunction with their
own. Thus, forcing manufacturers to account for such risks only serves to increase the
costs of producing their own product, without improving the incentive structure
surrounding the production of the product that actually caused the plaintiffs' harm.

However, the assumptions underlying this rationale do not hold in the context of a
Quirin claim, which requires a showing that (1) the defendant actually incorporated
asbestos-containing components into its original product, and (2) the defendant
"specified" the use of asbestos-containing replacement components, or such components
were "essential to the proper functioning" of the defendant's product. Quirin, 17 F. Supp.
3d at 769, 771. In these narrow circumstances, the original equipment manufacturer is
well-positioned to bear the costs of the risk associated with asbestos-containing
replacement parts. When a manufacturer actually incorporates a particular component
into its product, it cannot claim a lack of control over the risks associated with that
component, as the manufacturer has every opportunity to test that component and become
familiar with such risks. See Bell, 2016 WL 5780104, at *7 n.16 (recognizing that a
manufacturer has a duty to "investigate and warn" about risks associated with
components that the manufacturer puts into its product); Garvin, Case No. 2012-cp-40-
6675, slip op. at 13 (recognizing that Crane "had every opportunity to test and evaluate
the asbestos gaskets and packing used in its valves"). To the extent the manufacturer

_____

[16] Of course, the O'Neil court declined to address whether the bare metal defense
would apply in circumstances similar to those outlined in Quirin. O'Neil, 266 P.3d at
996 n.6. However, the court did indicate that the policy considerations underlying the
bare metal defense would still apply. Id.

designs or markets its product in such a way that the product will <u>always</u> require the same risk-bearing component, it exercises control over the risk associated with replacement components.  <u>Cf.</u> <u>Dandridge</u>, 2016 WL 319938, at *3 ("[A] product that 'inevitably' subjects its user to the possible hazards of asbestos exposure and a product that actually contains asbestos bear comparable causal relationships to their users' injuries.") (internal quotations omitted).  In a sense, the <u>Quirin</u> requirements serve to limit a manufacturer's liability to cases where the harm arises from risks that are effectively incorporated into the manufacturer's product, though they may be borne by a replacement component.  <u>Cf.</u> <u>May</u>, 129 A.3d at 999 ("The necessary replacement of asbestos components with identical components cannot be said to constitute a substantial modification.").  Thus, where <u>Quirin</u> applies, the equipment manufacturer has at least as much power to control the risks associated with the asbestos-containing replacement components as the component manufacturers themselves.  Indeed, some courts have suggested that equipment manufacturers may be in a <u>better</u> position to warn of such risks than the component manufacturers.  <u>See</u> <u>Bell</u>, 2016 WL 5780104, at *7 n.16 ("The manufacturer of the finished product containing asbestos may well be better placed to warn when compared to the manufacturer of an aftermarket wear item."); <u>In re N.Y.C. Asbestos Litig.</u>, 27 N.Y.3d at 791 ("[T]he end user is more likely to interact with the durable product over an extended period of time, and hence he or she is more likely to inspect warnings on that item or in associated documentation than to review warnings supplied by the maker of the 'wear item.'").

The defendant-manufacturer also derives a benefit from the sale of such components, "as the manufacturer is able to sell its own product to customers precisely

because the third party has sold to those customers another item that is essential to the

product's function." In re N.Y.C. Asbestos Litig., 59 N.E.3d at 472. This benefit should

not be conferred without the costs that attend it. Allowing equipment manufacturers to

reap profits conditioned on the proliferation of asbestos-containing replacement

components, while immunizing them from liability relating to such components, creates

an incentive structure that fails to account for the costs such manufacturers impose on

society. This result is socially inefficient—not to mention, palpably unjust. Restatement

(Second) of Torts § 402A comment c. ("[P]ublic policy demands that the burden of

accidental injuries caused by products intended for consumption be placed upon those

who market them, and be treated as a cost of production against which liability insurance

can be obtained.").[17] The naval workers who used Crane's products were certainly in no

---

[17] The court is aware that § 402A is often cited as a basis for restricting a manufacturer's liability to its own product. E.g., Conner, 842 F. Supp. 2d at 801. Nevertheless, in the narrow circumstances outlined by Quirin, the court is convinced that the rationale of § 402A weighs against the bare metal defense. This position is perhaps best explained by focusing on what constitutes the harmful "product" at the center of the analysis. Courts that have strictly applied the bare metal defense have consistently regarded the asbestos-containing replacement component as the "product," while courts that have cited § 402A in support of the Quirin-like approach have regarded the original piece of equipment as the "product." See May, 129 A.3d at 999 ("Common sense tells us that the pumps were what [r]espondents sold to the Navy, and the gaskets and packing are included within that product."); Garvin, Case No. 2012-cp-40-6675, slip op. at 17 ("When the asbestos gaskets and packing were replaced with the same materials that came with the valve, it was not a 'substantial change' in the condition of the product. The product remained the same as when sold—valves containing asbestos gaskets and packing."). If the original equipment is considered to be the "product" in question, then the application of § 402A becomes clear.

While this court prefers to refer to the asbestos-containing replacement component as separate "products," this is simply to avoid semantic confusion. The court reiterates its position that, where the requirements of Quirin are met, the risks associated with asbestos-containing replacement components are effectively incorporated into the equipment itself. Thus, the court accepts the logic of the May and Garvin decisions, even if it does not adopt the same phrasing. Were the court to phrase its analysis in the terms used by the May and Garvin courts, it would agree that installing asbestos-containing replacement components does not effect a "substantial change" to the equipment.

position to protect themselves against the dangers inherent in such use.  If a plaintiff can prove that an equipment manufacturer's actions rendered such exposure <u>inevitable</u>, there is little reason to treat the equipment manufacturer differently than the actual manufacturer of the asbestos-containing components that caused the plaintiff's harm.  <u>See</u> <u>In re N.Y.C. Asbestos Litig.</u>, 59 N.E.3d at 792–93 ("'[T]oday as never before the product in the hands of the consumer is often a most sophisticated and even mysterious article,' and given the practical inability of the users of modern products to detect the dangers inherent in their operation, 'from the standpoint of justice . . . , responsibility should be laid on the manufacturer.'" (quoting <u>Codling v. Paglia</u>, 298 N.E.2d 622, 627 (N.Y. 1973))).

There is one policy argument specific to maritime law that does favor <u>Conner</u>'s strict application of the bare metal defense:  the goal of uniformity.  <u>Devries</u>, 188 F. Supp. 3d at 463.  Concerns with uniformity are at the heart of maritime law.  As the <u>Cabasug</u> court recognized, the Constitution intended maritime law to be

> a system of law coextensive with, and operating uniformly in, the whole country. It certainly could not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states.

<u>Cabasug</u>, 989 F. Supp. 2d at 1036 (quoting <u>Am. Dredging Co. v. Miller</u>, 510 U.S. 443, 451 (1994)).

The <u>Conner</u> approach provides a bright-line rule that calls for very little factual analysis; the court looks for evidence that the plaintiff was exposed to asbestos fibers that the defendant actually manufactured, and if there is no such evidence, the claim fails. <u>Conner</u>, 842 F. Supp. 2d at 801 ("[U]nder maritime law, a manufacturer is not liable for

31

harm caused by, and owes no duty to warn of the hazards inherent in, asbestos products that the manufacturer did not manufacture or distribute."). The <u>Quirin</u> approach, in contrast, requires analysis of several additional factors: (1) whether the defendant actually incorporated asbestos-containing components in its original product, and (2) whether the defendant specified the use of such components or the defendant's product required such components to function properly. <u>Quirin</u>,17 F. Supp. 3d at 769, 771. These factors present interpretive questions that could lead to divergent results. For instance, courts could disagree on what it means to "specify" the use of a component. <u>Compare</u> <u>Bell</u>, 2016 WL 5780104, at *3 n.11 (finding that a manufacturer should not be permitted to escape liability for "affirmatively recommend[ing]" the use of asbestos components simply "because the manufacturer did not make, sell, or otherwise control the asbestos");[18] <u>with</u> <u>Andrews</u>, 2015 WL 12831342, at *2 (distinguishing between

---

[18] As previously noted in footnote 3, the <u>Bell</u> decision analyzed the issue using a somewhat different framework than most other courts. The above-cited language was offered in connection with the <u>Bell</u> court's finding that

> [e]ven if defendants do not have a duty to warn arising out of merely manufacturing a particular product that might be used with asbestos, they can nonetheless have duties arising out of taking the <u>additional action</u> of negligently recommending that a plaintiff use asbestos in conjunction with the manufacturer's products.

<u>Bell</u>, 2016 WL 5780104, at *3 (emphasis in original). Thus, the <u>Bell</u> court appears to have been discussing manufacturers' "recommendations" as a basis for liability under a negligent misrepresentation theory, not a failure-to-warn theory. While this may distinguish the cited language from the instant discussion, the court highlights such language to show that there is room for disagreement regarding the level of "specification" required to support a finding of liability.

The court wishes to clarify that it has not endeavored to address the <u>Bell</u> courts negligent misrepresentation theory in this decision. Because the court ultimately finds that Crane incorporated asbestos-containing components in the equipment it supplied the Navy and specified the use of such components, the court concludes that plaintiffs have provided enough evidence to support a failure-to-warn claim under <u>Quirin</u>. The court

"recommending" the use of asbestos-containing components, and "specifying" the use of

such components). Courts could also disagree on what it means for a product to

"require" asbestos-containing components to function properly. Though this language

would appear to suggest that the asbestos-containing components be mechanically

"essential," see Quirin, 17 F. Supp. 3d at 769–70 ("[A] duty may attach . . . where the

asbestos-containing material was essential to the proper functioning of the defendant's

product . . . ."), some courts have expanded this concept to include "economic necessity."

In re N.Y.C. Asbestos Litig., 59 N.E.3d at 474 (imposing duty to warn "where a

manufacturer creates a product that cannot be used without another product as a result of

the design of the product, the mechanics of the product or the absence of economically

feasible alternative means of enabling the product to function as intended") (emphasis

added). It is also not entirely clear that all of the courts that have adopted Quirin have

included what this court regards as the first factor of the Quirin-test—whether the

defendant actually incorporated asbestos-containing components in its original product.

See Osterhout v. Crane Co., Case No. 5:14-cv-0208, slip op. 25 (N.D.N.Y. March 21,

2016) (finding duty to warn where "[defendant] shipped its boilers to the Navy

. . . without external asbestos insulation," but "provided the Navy with engineers to assist

in the erection, insulation, and installation of its boilers"). Given the potential for

disagreement inherent in the Quirin approach, the court has little trouble finding that

adoption of Conner's strict application of the bare metal defense would likely lead to

more consistent results, better serving maritime law's uniformity interests.

---

takes no position on whether the negligent misrepresentation theory posited by the Bell
court is viable or what evidence would be required to support it.

However, uniformity is not the sole interest of maritime law.  See Bell, 2016 WL 5780104, at *3 n.11 ("[O]ur interest in uniformity, though powerful, does not require us to adopt legal conclusions we believe to be in error." (quoting Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat. Ass'n, 758 F. 3d 592, 601 (5th Cir. 2014)).  "[O]ne of the primary goals of maritime law [is] to protect maritime workers from the perils of working at sea."  Mack v. Gen. Elec. Co., 896 F. Supp. 2d 333, 338 (E.D. Pa. 2012).  For the reasons outlined above, the Quirin approach serves to protect maritime workers in the same way that traditional products liability doctrines protect consumers.  It forces manufacturers to account for the risks they impose on others through the sale of their products, and provides an avenue of relief for those injured by such products.  Restatement (Second) of Torts § 402A comment c. ("[P]ublic policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained.").  Ultimately, the court finds the law's interest in protecting the maritime workers more significant than its interest in uniformity, and therefore, concludes that policy considerations weigh in favor of adopting the Quirin approach.

### 4.    Adopting and Clarifying the Quirin Approach

Having determined that the Quirin approach (1) is not foreclosed by Lindstrom, (2) is more consistent with the majority position under state law, and (3) is favored by the relevant policy considerations, the court holds that plaintiffs' failure-to-warn claims are not foreclosed by the bare metal defense.

34

This leads to a secondary question: what evidence does <u>Quirin</u> require? Plaintiffs state that <u>Quirin</u> simply requires evidence that the defendant "designed its products to be used with asbestos-containing materials and actually incorporated asbestos-containing materials into the products it sold." Pls.' Resp. 11 (quoting <u>Quirin</u>, 17 F. Supp. 3d at 771). Crane reads this court's decision in <u>Dandridge</u> to establish a three-pronged test, requiring evidence that: "(i) the asbestos containing product was incorporated into the equipment when sold; (ii) the product needed asbestos containing components to function; and (iii) the manufacturer provided specifications for such use." Def.'s Reply 4 (emphasis added).

There is no dispute that that the court views "actual incorporation" of asbestos-containing components into the original product as an independent, strict requirement of the test. Indeed, this understanding of <u>Quirin</u> was essential to the court's holding in <u>Dandridge</u>. <u>See Dandridge</u>, 2016 WL 319938, at *4 (granting summary judgment after finding "no evidence that Crane 'actually incorporated asbestos-containing materials into the products it sold'" (quoting <u>Quirin</u>, 17 F. Supp. 3d at 771)). However, the court does not regard the second and third prongs of Crane's three-pronged test in the same way. A review of the <u>Dandridge</u> decision indicates that the language Crane relies on was merely used to describe the facts the <u>Quirin</u> court highlighted in recognizing a duty-to-warn. <u>Id.</u> at *4. The court described the <u>Quirin</u> decision as follows:

> In Quirin, the court found that a manufacturer's duty to warn of risks relating to asbestos-containing materials arose where: (i) the manufacturer "designed its products to be used with asbestos-containing materials and actually incorporated asbestos-containing materials into the products it sold;" (ii) the manufacturer's product "needed asbestos-containing components to function properly" when used in the manner intended by the purchaser; and (iii) the manufacturer "provided specifications" for such use.

Dandridge, 2016 WL 319938, at *4 (quoting Quirin, 17 F. Supp. 3d at 770–71). Immediately following this language, the court offered a similar summary of the Andrews decision, which applied Quirin's rationale where the manufacturer "incorporated asbestos-containing components into its product . . . and specified the use of asbestos-containing replacement parts in its product."  Id. (quoting Andrews, 2015 WL 12831315, at *6).  The court then compared Quirin and Andrews, stating that "[c]rucially, the circumstances presented in both Quirin and Andrews were sufficient to invoke Quirin's underlying rationale—that a duty to warn arises when a defendant manufacturer's conduct makes the plaintiff's asbestos exposure "inevitable," not simply foreseeable."  Id. (emphasis added).  This explanation indicates that the "crucial" aspect of the analysis is not whether the case was on all fours with every aspect of Quirin, but whether the rather demanding concept of inevitability applies.

The Quirin decision explicitly states that this concept may apply where "the use of asbestos-containing materials was specified by a defendant" or "was essential to the proper functioning of the defendant's product."[19]  Quirin, 17 F. Supp. 3d at 769. Therefore the court holds that, to bring a failure-to-warn claim under Quirin, a plaintiff must show: (1) the defendant actually incorporated asbestos-containing components into its original product, 17 F. Supp. 3d at 771, and (2)(a) the defendant "specified" the use of asbestos-containing replacement components, or (b) such components were "essential to the proper functioning" of the defendant's product.  Id. at 769.

_____

[19] The Quirin court leaves open the possibility that there may be other circumstances where the use of asbestos-containing materials "was for some other reason so inevitable that, by supplying the product, the defendant was responsible for introducing asbestos into the environment at issue."  Quirin, 17 F. Supp. 3d at 769.  This court also holds open this possibility, but takes no position on what such circumstances would entail.

### C.     Application of __Quirin__ in this Case

Here, plaintiffs have certainly provided evidence that Crane incorporated asbestos-containing components into the valves it supplied for use on the ships Chesher served on.  Crane admits that it "supplied valves and related parts" to certain of those ships and that its valves were approved for use on others.  Pls.' Resp. Ex. 8, Answers to Interrogs. 20–21.  Crane separately admits that it enclosed "asbestos-containing gaskets, packing, or discs" inside of certain of its valves.  Id. at 21.  From these admissions, it is reasonable to infer that some of the Crane valves on the ships on which Chesher served actually incorporated asbestos-containing components at the time they were supplied.  If Crane's own admissions were not enough, Dr. Anthony Pantaleoni ("Pantaleoni") testified that the Navy would have required Crane to include the exact components parts listed on the Navy-approved valve design drawings, and identified a number of design drawings that called for the use of asbestos-containing components in valves supplied to the ships where Chesher served.  Pantaleoni Dep. at 24:1–26:24, 57:7–58:7, 63:3–64:22, 72:9–18.

There is also evidence that Crane "specified" the use of such components.  Pantaleoni and plaintiff's expert, Capt. Arnold Moore ("Moore"), both discuss certain design drawings of Crane valves installed on the USS Henderson, USS Fox, and USS Kraus.  Both experts agree that these drawings specify the use of asbestos-containing internal bonnet gaskets and stem packing.  Moore Aff. ¶ 17; Pantaleoni Dep. at 24:1–26:24, 57:7–58:7, 63:3–64:22, 72:9–18.  Crane argues that it was the Navy, not Crane, that required the use of such components, and cites paragraph 23 of Moore's affidavit for support.  Def.'s Reply 4–6.  While that paragraph does acknowledges that the Navy

provided specifications for the valves and de-aerating feed tanks it purchased, it also plainly states that the Navy's specifications did not prevent manufacturers from designing their own products and permitted the use of both asbestos and non-asbestos components on products that were not exposed to superheated steam.  Moore Aff. ¶ 23.  Thus, to the extent Crane provided valves that were not exposed to superheated steam, the Moore affidavit indicates that Crane was ultimately responsible for specifying the use of asbestos-containing gaskets and packing.[20]

Crane also highlights Pantaleoni's testimony that "the Navy would specify what Crane [] had to provide.  And in order for the Navy to accept it[,] Crane would have to adhere [to] the specification."[21]  Pantaleoni Dep. at 24:15–18; see also id. at 48:22–24 ("Once again, the Navy set the requirements as to whether or not it was going to be asbestos or non-asbestos.").  The court does not doubt that Pantaleoni's testimony suggests that it was not Crane's decision to "specify" the use of asbestos-containing replacement components.  Moreover, the court agrees that when the consumer, not the manufacturer, makes the decision to utilize asbestos-containing components with a product that is fully compatible with non-asbestos components, the "inevitability"

---

[20] The Moore affidavit provides similar evidence with respect to the de-aerating feed tanks.  Moore Aff. ¶¶ 19, 21.

[21] The court assumes that the "drawings" discussed in the excerpts of Pantaleoni's February 26, 2016 deposition are the same "drawings" referenced by Moore in paragraph 17 of his affidavit.  See Pantaleoni Dep. at 35:22–36–25, 40:3–41:15, 44:17–20 (referencing drawing numbers 22139, 22152, 22391, and 22414); Moore Aff. ¶ 17 (referencing Crane drawing numbers 22139, 22152, 22391 and 22414).  To the extent Pantaleoni was not talking about the same drawings as Moore, that suggests that Pantaleoni's opinion does not directly contradict Moore's and strengthens the court's conclusion that plaintiffs have presented sufficient evidence to raise a genuine issue of fact as to whether Crane specified the use of asbestos-containing replacement components.

rationale underlying Quirin does not apply.[22]  However, the fact that Pantaleoni's testimony supports such an argument does not mean that Crane is entitled to summary judgment.  While Pantaleoni takes the position that the design drawings reflect the Navy's decision to require asbestos-containing components, Moore has taken the position that such drawings reflect Crane's design specifications.  This is a quintessential dispute of material fact, and such disputes must be resolved by the jury.

### D.       Substantial Factor Causation

Crane last attempts to argue that, in the event the court finds that it is legally responsible for the asbestos-containing replacement components used with its valves and de-aerating feed tanks, summary judgment is still appropriate because plaintiffs have failed to produce evidence that their exposure to such components was a "substantial factor" in causing Chesher's injury.  Def.'s Reply 1–3.  The court first notes that argument was not raised until Crane filed its reply.  "The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered."  Clawson v. FedEx Ground Package Sys., Inc., 451 F. Supp. 2d 731, 734 (D. Md. 2006); see also Bouchard v. Synchrony Bank, No. 2:16-cv-1713, 2016 WL 3753220, at *3 (D.S.C. July 14, 2016) ("An argument raised for the first time in a reply brief or memorandum will not be considered.").

---

[22] Of course, the fact that asbestos-containing components were specified at all might suggest that the valves could not function without such components.  The court recognizes there is also evidence that there were suitable, non-asbestos substitutes. Pantaleoni Dep. at 48:18–49:2, 90:1–5 (referencing availability of non-asbestos components); Moore Aff. ¶ 23 (recognizing that most Navy specifications allowed a range of materials that included non-asbestos alternatives).  Because the court finds there is sufficient evidence to find that Crane "specified the use of asbestos-containing components," it declines to address whether there is a genuine issue of material fact as to whether asbestos-containing components were "essential to the proper functioning" of Crane's valves.

Additionally, this argument is woefully underdeveloped.  Crane relies heavily on the Ninth Circuit's decision in <u>McIndoe v. Huntington Ingalls Inc.</u>, where the court determined that evidence of the decedent's "frequent" exposure to asbestos-containing insulation was insufficient to satisfy the substantial factor standard because plaintiff "presented no evidence regarding the <u>amount</u> of exposure to dust from originally installed asbestos, or critically, the <u>duration</u> of such exposure during any of these incidents."  817 F.3d 1170, 1176 (9th Cir. 2016) (emphasis in original).  However, the <u>McIndoe</u> decision was also premised on the court's rejection of the plaintiff's expert testimony on the "every exposure" theory, which posits that "<u>every</u> exposure to asbestos above a threshold level is necessarily a substantial factor in the contraction of asbestos-related diseases." <u>Id.</u> at 1177.  Crane's summary judgment briefing does not address the opinions of plaintiff's expert Dr. Carlos Bedrossian ("Bedrossian"), who will testify that each of defendants' products contributed to Chesher's development of mesothelioma, ECF No. 181-1 at 8, or Dr. Edwin C. Holstein, who is expected to testify about the quantities of asbestos that are released when removing and replacing asbestos-containing gaskets and packing.  ECF No. 181-5 at 2–3.  Consequently, the court is not in a position to assess Chesher's exposure to asbestos contained in Crane's valves because the court has not determined whether plaintiffs' experts' opinions can be considered in the substantial factor analysis.

The court has scheduled a <u>Daubert</u> hearing to address Crane's challenge to Bedrossian's opinions.  Once that challenge is resolved, the court will permit Crane to file a separate motion for summary judgment renewing its substantial factor argument. The court is aware that, in appropriate circumstances, it has discretion to consider

arguments raised for the first time in a reply brief.  However, in this instance, the court concludes that the better course of action is for all parties to fully brief the issue after Crane's motion to exclude Bedrossian's testimony has been decided.

## IV.   CONCLUSION

For the foregoing reasons, the court **DENIES** Crane's motion for summary judgment.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**February 13, 2017**
**Charleston, South Carolina**