IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| JAMES WILSON CHESHER, and<br>CHERYL ANN CHESHER, | )<br>)<br>) | |
| Plaintiffs, | )<br>) | No. 3:15-cv-02123-DCN |
| vs. | )<br>) | **ORDER** |
| 3M COMPANY, *et al.*, | )<br>) | |
| Defendants. | )<br>) | |

This matter is before the court on defendant Crane Co.'s ("Crane") renewed motion for summary judgment, ECF No. 313. For the reasons stated below, the court grants the renewed motion for summary judgment.

## I. BACKGROUND

James Wilson Chesher ("Chesher") is a former machinist mate and a commissioned officer in the U.S. Navy. He and his wife, Cheryl Ann Chesher, (collectively, "plaintiffs") allege that Chesher's exposure to asbestos throughout his Naval career caused him to develop mesothelioma. Compl. ¶¶ 31–34. Chesher served in the Navy from 1965 to 1989. For a significant portion of his career, Chesher conducted or oversaw maintenance and repair work on various types of equipment, including valves and de-aerating feed tanks—large tanks which remove dissolved oxygen from the water before it is sent to the boiler. ECF No. 226-1, Chesher Video Dep. at 21:21–22:17, 26:10–22; ECF No. 226-2, Chesher First Dep. at 147:7–14. Chesher's work on valves required him, or his subordinate, to remove and replace internal packing and bonnet gaskets, which were frequently made from asbestos-containing materials. Chesher Video

1

Dep. at 26:10–22 (describing work on internal packing and bonnet gaskets); ECF No. 226-9, Pantaleoni Dep. at 24:5–26:24, 57:7–25, 63:3–64:22, 72:9–18 (discussing drawings of valves approved for use by the Navy that specified the use of asbestos-containing materials); ECF No. 226-10, Moore Aff. ¶ 17 (noting that Crane drawings specified use of asbestos containing internal packing and bonnet gaskets for certain valves installed on the USS Henderson and USS Fox). This work produced dust which Chesher breathed in. Pantaleoni Dep. at 27:20–28:25, 30:1–30:21. Chesher's work on de-aerating feed tanks required him to access nozzles inside the tank by crawling through a manhole. Chesher First Dep. at 53:11–15. The record contains evidence that this manhole was sealed by an asbestos-containing gasket, Moore Aff. ¶ 19, which needed to be removed and replaced whenever the tank was inspected. ECF No. 226-3, Chesher Second Dep. at 456:13–18.

Crane supplied valves for use on board the ships where Chesher performed, or closely supervised, valve maintenance.[1] ECF No. 226-8, Crane Answers to Interrogs. at 20. Indeed, Chesher recalls working on Crane valves frequently throughout his career. Chesher Second Dep. at 420:4–15. Though Crane did not manufacture asbestos-containing sheet packing or gaskets, these products were installed in Crane's valves at the time they were supplied to the Navy, see Pantaleoni Dep. at 24:5–11, 24:24–25:5 (indicating that Crane would have to provide component parts as specified in design

---

[1] Crane admits to supplying valves to the USS Cadmus, USS Fox, USS Mahan, and USS Pratt. ECF No. 226-8, Answers to Interrogs. 20. Crane cannot confirm whether it sold valves for use on the USS Henderson and USS Kraus, but has found documentation indicating that its valves were approved for use on those ships. Id. Additionally, plaintiffs' expert contends that Crane's documents show that it supplied valves used on the USS Henderson, USS Fox, and USS Kraus. Moore Aff. ¶ 17. The court finds this evidence sufficient to raise a genuine issue of fact as to whether Crane valves were used on all the ships Chesher served on during the relevant portion of his career.

drawings at time of delivery), and Crane was aware that the valves' sheet packing and gaskets would need to be replaced periodically. ECF No. 226-5, Crane Catalog No. 60 at 10–11. Crane is also alleged to be the successor-in-interest to Cochrane Corp. ("Cochrane"), which manufactured the de-aerating feed tanks for two of the ships on which Chesher served. Moore Aff. ¶ 19. Like the gaskets used in Crane valves, the gaskets used to seal the manhole on the de-aerating feed tanks would have been replaced periodically—namely, each time the tanks were opened. Id. ¶ 20.

On April 15, 2015, plaintiffs brought the instant action in the Court of Common Pleas in Richland County, South Carolina, alleging claims for negligence, gross-negligence, negligence per se, conscious pain and suffering, punitive damages, and loss of consortium against a number of defendants. The action was removed to this court on May 22, 2015. ECF No. 1. On March 4, 2016, Crane filed a Daubert motion to preclude specific causation testimony from plaintiffs' expert, Dr. Carlos Bedrossian ("Dr. Bedrossian"). ECF No. 181. The court held an evidentiary hearing on the matter on February 28, 2017, ECF No. 311, and issued an order granting Crane motion on July 21, 2017, ECF No. 312. On August 9, 2017, plaintiffs filed a motion for reconsideration of the order excluding Dr. Bedrossian's specific causation testimony. ECF No. 314. On August 1, 2017, Crane filed a renewed motion for summary judgment, ECF No. 313, and plaintiffs filed a response on August 10, 2017, ECF No. 315. On December 12, 2017, the court held a hearing on the motion for reconsideration and the renewed motion to dismiss, at which it denied Chesher's motion for reconsideration. ECF No. 321. The renewed motion for summary judgment has been fully briefed and is ripe for the court's review.

## II.  STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

## III.  DISCUSSION

### A.  Jurisdiction and Choice of Law

At the outset, the court notes that the parties agree that the issues presented by Crane's motion fall within the court's admiralty jurisdiction and that this case is therefore governed by maritime law.  Def.'s Mot. 5–7; Pls.' Resp. 9.  Nevertheless, the court

briefly addresses the issue below in order to more authoritatively establish the basis of the court's jurisdiction and the source of the appropriate substantive law.

The court has federal admiralty jurisdiction over a tort claim if conditions of location and "connection with maritime activity" are met. Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995). The location test is met if either "the tort occurred on navigable water" or the "injury suffered on land was caused by a vessel on navigable water." Id. The connection test has two prongs: (1) "whether the incident involved was of a sort with the potential to disrupt maritime commerce"; and (2) "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." Id. at 539.

In asbestos cases, courts applying the location test look to where the plaintiff was exposed to asbestos. See, e.g., Conner v. Alfa Laval, Inc., 799 F. Supp. 2d 455, 466-67 (E.D. Pa. 2011); Bartel ex rel. Estate of Rich v. A-C Prod. Liab. Trust, 461 F. Supp. 2d 600, 604-05 (N.D. Ohio 2006). Here, all of Chesher's work with Crane valves and Cochrane de-aerating feed tanks occurred when he was serving as a machinist mate and commissioned officer aboard ships in navigable water. Therefore, the location test is met.

With respect to the first prong of the connection test—whether the incident involved was of a sort with the potential to disrupt maritime commerce—the court must look to the "potential effects" of the incident on maritime commerce and ask "whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping." Grubart, 513 U.S. at 539. Asbestos MDL Judge Eduardo C. Robreno of the Eastern District of Pennsylvania has held that "claims involving plaintiffs

who were sea-based Navy workers" as well as the claims of "shipyard workers" who were "primarily sea-based during the asbestos exposure" meet this test. Conner, 799 F. Supp. 2d at 466–68. Here, it is undisputed that any asbestos exposures related to Crane's valves or Cochrane's deaerating feed tanks were primarily sea-based. Thus, the first prong of the connection test is met.

Then, the court must determine whether the tortfeasor's activity has a substantial relationship to traditional maritime activity. Grubart, 513 U.S. at 539–40. Judge Robreno has found a substantial relationship to maritime activity where "the allegedly defective product was produced for use on a vessel." Id. at 466. Here, the valves and deaerating feed tanks at issue were all produced for Navy vessels, thus satisfying the second prong of the connection test. Having established that both the "location" and "connection" tests are satisfied, the court has admiralty jurisdiction over the claims against Crane. Because the Court has admiralty jurisdiction over these claims, it must apply maritime law. See E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864 (1986) ("With admiralty jurisdiction comes the application of substantive admiralty law."). "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." Id. at 864–65.

"The role of state law in maritime cases is significant and complex." Wells v. Liddy, 186 F.3d 505, 524 (4th Cir. 1999). A "fundamental feature of admiralty law" is that "federal admiralty courts sometimes do apply state law." Grubart, 513 U.S. at 546. State law may be used to supplement federal maritime law as long as state law is "compatible with substantive maritime policies" and is not "inconsonant with the

substance of federal maritime law." Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 202 (1996); see also Askew v. Am. Waterways Operators, Inc., 411 U.S. 325, 341 (1973) ("Even though Congress has acted in the admiralty area, state regulation is permissible, absent a clear conflict with the federal law."); Princess Cruises, Inc. v. Gen. Elec. Co., 143 F.3d 828, 834 (4th Cir. 1998) ("When no federal statute or well-established rule of admiralty exists, admiralty law may look to the common law or to state law, either statutory or decisional, to supply the rule of decision."); Byrd v. Byrd, 657 F.2d 615, 617 (4th Cir. 1981) ("[A]dmiralty law, at times, looks to state law, either statutory or decisional, to supply the rule of decision where there is no admiralty rule on point."). However, "state law may not be applied if it conflicts with, or seeks to materially change, federal maritime law." see e.g., State of Md. Dep't of Natural Res. v. Kellum, 51 F.3d 1220, 1226 (4th Cir. 1995).

Thus, the court applies substantive maritime law supplemented by state law to the extent that it does not conflict with well-established maritime law.

**B. Plaintiffs' Motion for Reconsideration of the Court's Exclusion of Dr. Bedrossian's Testimony**

The court provides a basic summary of its order from the bench denying plaintiffs' motion to reconsider the court's earlier order excluding the expert testimony of Dr. Bedrossian, as it relates to the court's decision to grant Crane's motion for summary judgment. The court granted the motion to exclude Bedrossian's specific causation testimony because it found that under Federal Rule of Evidence 403, the probative value of the testimony is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. ECF No. 312, at 15. Federal Rule of Evidence 403

empowers the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Courts are afforded broad discretion in deciding evidentiary matters, particularly under Rule 403, which "requires an 'on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant.'" Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384. (2008) (quoting 1 S. Childress & M. Davis, Federal Standards of Review § 4.02, p. 4–1 (3d ed. 1999)).

In a products liability action under maritime law, the plaintiff must show "that (1) he was exposed to the defendant's product, and (2) the product was a substantial factor in causing the injury he suffered." Lindstrom v. A-C Prod. Liab. Trust, 424 F.3d 488, 492 (6th Cir. 2005) (emphasis added). Plaintiffs offered Dr. Bedrossian as an expert to give specific causation testimony that Chesher's exposure to Crane's products was a substantial factor in causing his mesothelioma. The court granted Crane's motion to exclude Dr. Bedrossian's specific causation testimony, because it found that his opinions amounted to the "every exposure" theory—a theory about the causal link between exposure to asbestos and mesothelioma. ECF No. 312. This theory was rejected by Lindstrom as an insufficient basis from which to demonstrate that a product was a substantial factor in causing mesothelioma.

The court's original order offered an extensive analysis in support of its conclusion that Bedrossian's opinions amounted to the "every exposure" theory that had been rejected by Lindstrom. "The trouble with Bedrossian's opinions is his application

of these principles to conclude that, because Haskins and Chesher's exposures to the defendants' asbestos-containing products were—by definition—part of their respective 'cumulative doses,' such exposures significantly contributed to their development of mesothelioma." Id. at 12. "Bedrossian openly admits that he did not even need to know Haskins or Chesher's actual level of exposure to defendants' products in order to render his opinion." Id. citing Tr. 79:16–22. "Instead it appears that Bedrossian assumes that, because every 'occupational' exposure contains exponentially more fibers than any background exposure, every 'occupational' exposure significantly contributes to the total cumulative dose. Thus, in Bedrossian's view, whenever the total cumulative dose results in mesothelioma, every 'occupational' exposure should be considered causative, no matter how small." Id. at 313. "Bedrossian's opinions on specific causation essentially amount to the 'every exposure' theory that Lindstrom rejected—a position that has been affirmed in subsequent decisions applying maritime law." Id. at 14. The court found that if the total cumulative exposure causes mesothelioma, then a single exposure or set of exposures—for example, Chesher's work with Crane's products—should not be considered a "substantial cause" of the disease. Id. at 17. Because Bedrossian's opinions are based on a method that has been rejected by the courts, the court found that they are not relevant, and any probative value they may have is easily outweighed by their tendency to confuse or mislead the jury. Id. at 15. Thus, the court denied plaintiffs' motion to reconsider.

### C. Crane's Renewed Motion for Summary Judgment

Crane's renewed motion for summary judgment argues that plaintiffs lack the evidence necessary to make out a <u>prima facie</u> claim at trial without Bedrossian's specific causation testimony. ECF No. 313, at 1. The court agrees.

Products liability claims under maritime law require a plaintiff to show that: "(1) he was exposed to the defendant's product, and (2) the product was a substantial factor in causing the injury he suffered." <u>Lindstrom</u>, 424 F.3d at 492. Plaintiffs must "bring forward some evidence of actual cause; the mere showing that the asbestos manufacturer's product was present somewhere at his place of work is insufficient." <u>Stark v. Armstrong World Indus., Inc.</u>, 21 F. App' x 371, 376 (6th Cir. 2001). Courts "do not require that cause necessarily be established by expert testimony." <u>Id.</u> In fact, plaintiffs can prove that a product was a substantial factor in causing a plaintiff's injury by offering evidence of substantial exposure to a defendant's product for a substantial period of time. <u>Lindstrom</u>, 424 F.3d at 492. However, the substantial factor test requires "a plaintiff relying on circumstantial evidence of exposure to prove causation to show a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." <u>Stark</u>, 21 F. App'x at 376.

A review of the case law reveals that Chesher has not sufficiently demonstrated that his exposure to defendant's asbestos-containing products can satisfy the substantial factor test. <u>Stark</u> involved a maritime action alleging that the plaintiff was harmed by exposure to asbestos. <u>Id.</u> at 372. Stark, the plaintiff, sailed as a merchant mariner for over forty years, during which time he claimed to have worked with numerous pieces of equipment that contained asbestos. <u>Id.</u> at 373. Stark alleged that during his work in the

engine and boiler rooms he frequently breathed in asbestos that was released into the air, which caused him to develop mesothelioma. Id. The Sixth Circuit summarized the "substantial factor" test by noting that "the plaintiff must [ ] bring forward some evidence of actual cause" and that "the mere showing that the asbestos manufacturer's products was present somewhere at his place of work is insufficient." Id. at 375 (internal quotation marks omitted). Although admitting that it is not absolutely necessary that cause be established by expert testimony, the court noted its "concern that defendants not be subjected to open-ended liability based solely on a jury's inexpert speculation." Id. (internal quotation marks omitted). Stark chose to rely on his own testimony to put forth a circumstantial case, rather than using expert testimony. Id. at 380. With respect to Stark's claim to have been exposed to asbestos for two months, the court found that, "without testimony that the type of exposure he suffered was particularly harmful, this would seem to be insufficient for a rational jury to find this exposure was a 'substantial factor' in Stark's mesothelioma." Id.

While the Sixth Circuit found that two months of exposure was insufficient was be a substantial factor, the Michigan Supreme Court found that proof of a plaintiff's "repeated and heavy exposure" for six to nine months to pipe materials containing asbestos, which generated large quantities of visible dust upon removal, could reasonably lead a jury to conclude that this exposure was a substantial factor in causing the plaintiff's mesothelioma. Brisboy v. Fibreboard Corp., 418 N.W.2d 650, 654 (M.I. 1988). Notably in Brisboy, the plaintiff also presented expert testimony from a physician that "the presence of the [asbestos] fibers [in the plaintiff's lungs] and the resulting asbestosis were the major factors causing [the plaintiff's] lung cancer. Id.

11

Recently, the Ninth Circuit has refined the substantial factor test. McIndoe v. Huntington Ingalls, Inc., 817 F.3d 1170 (9th Cir. 2016), involved a suit brought on behalf of a deceased naval serviceman, James McIndoe ("McIndoe"), who spent several years aboard various ships containing pipes laden with asbestos insulation. McIndoe, 817 F.3d at 1172. McIndoe claimed to have been present when the insulation was removed, causing asbestos fibers to float through the air he breathed. Id. He ultimately died from complications related to mesothelioma. Id. In analyzing whether the asbestos was a cause of McIndoe's injuries, the Ninth Circuit first echoed the traditional rule that "absent direct evidence of causation, a party may satisfy the substantial-factor test by demonstrating that the injured person had substantial exposure to the relevant asbestos for a substantial period of time." McIndoe, 817 F.3d at 1176. The court found that the evidence of McIndoe's being "frequently present" during the removal of the insulation failed to meet this test, because there was "no evidence regarding the amount of exposure to dust from [the] originally installed asbestos, or critically, the duration of such exposure during any of these incidents." Id. The court concluded that without this evidence, the plaintiffs "can only speculate[] to the actual extent of his exposure to asbestos." Id.

The instant action resembles Stark in that neither plaintiff offered direct evidence of specific causation through expert medical testimony. Unlike Stark, however, Chesher seems to claim to have been exposed to defendant's asbestos product for more than two months, and as such, the Stark court's decision that the plaintiff's exposure was not substantial enough does not necessarily foreclose plaintiffs' claims. Chesher may argue that he was exposed to asbestos in the same manner as the plaintiff in Brisboy. However, in Brisboy, the plaintiff presented evidence of consistent exposure to clearly visible

asbestos particles for six to nine months and had an expert testify that the plaintiff's breathing in of asbestos particles was the specific cause of his mesothelioma. By contrast, Chesher cannot rely on any such expert testimony, nor has he alleged six straight months of continuously breathing in asbestos-laden air.

Although Chesher has alleged more exposure than the plaintiff in Stark, he has not presented any evidence regarding the actual amount of asbestos dust he was exposed to or the duration of his exposure. As McIndoe makes clear, if a plaintiff does not present specific causation testimony, then he must provide evidence on the amount of asbestos dust he was exposed to and approximately how long he actually breathed in this asbestos-laden air in order for him to sufficiently allege that an exposure was substantial enough to constitute a "substantial factor" in causing his injury. Chesher alleged that for over twenty years in the Navy he conducted or oversaw maintenance work on equipment which contained asbestos and that this work released asbestos into the air that he breathed. ECF No. 226-1, Chesher Video Dep. at 21:21–22:17, 26:10–22; ECF No. 226-2, Chesher First Dep. at 147:7–14; ECF No. 226-3, Chesher Second Dep. at 456; ECF No. 226-9, Pantaleoni Dep. at 24:5–26:24, 27:20–28:25, 30:1–30:21, 57:7–25, 63:3–64:22, 72:9–18. However, none of this deposition testimony alleges specifically how much asbestos dust he was exposed to or approximately how long he was exposed to it. Allegations of periodic exposure over the course of twenty-four years of work is not sufficient "evidence of substantial exposure for a substantial period of time to provide a basis for the inference that the product was a substantial factor in causing the injury." Lindstrom, 424 F.3d at 492.

Because Chesher has failed to put forth sufficiently specific evidence of substantial exposure, the court finds that he has failed to establish that Crane's product was a substantial factor in causing the injury he suffered. Having failed the substantial factor test, and having no expert testimony on specific causation, Chesher has not established a <u>prima</u> <u>facie</u> case under maritime law for a products liability mesothelioma action. Accordingly, the court grants defendant's motion for summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the court **GRANTS** Crane Co.'s renewed motion for summary judgment.

**AND IT IS SO ORDERED.**

---
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 29, 2018**
**Charleston, South Carolina**